2017 UT App 182

STATE of Utah, Appellee,

v.

Allan BRUUN and James Diderickson, Appellants.

Nos. 20140295-CA and 20140296-CA

Court of Appeals of Utah.

Filed September 28, 2017

Clifton W. Thompson, Attorney for Appellant Allan Bruun

Karra J. Porter and J.D. Lauritzen, Salt Lake City, Attorneys for Appellant James Diderickson

Sean D. Reyes, Ryan D. Tenney, and Jeffrey S. Gray, Salt Lake City, Attorneys for Appellee

Judge Stephen L. Roth authored this Opinion, in which Judge Gregory K. Orme and Senior Judge Pamela T. Greenwood concurred.[1]

Opinion

ROTH, Judge:

¶1 Allan Bruun and James Diderickson appeal their convictions on multiple counts of theft and one count each of a pattern of unlawful activity. They further appeal the restitution the district court ordered for those convictions. We affirm.[2]

## BACKGROUND [3]

¶2 In 1989, a Utah County couple (the Victims) bought forty-two acres of land in Saratoga Springs. Although they sold approximately thirteen acres over the years, they retained twenty-nine acres (the Property) as a "nest egg" to fund their retirement.

¶3 In August 2007, the Victims entered into two agreements with Bruun and Diderickson (collectively, Defendants) to develop the Property. First, pursuant to a Real Estate Purchase Agreement (REPC), the Victims agreed to sell the Property to Equity Partners LLC, a company in which Defendants held interests through another company, Four Winds Development Group LLC (Four Winds).[4] The purchase price was $3.5 million, with $750,000 to be paid to the Victims up front. Second, the Victims and Defendants formed Tivoli Properties LLC (Tivoli) to develop the Property, with Equity Partners owning a 75% interest in the company and the Victims together owning the remaining 25% interest. In connection with the formation of Tivoli, the parties executed an operating agreement (the Operating Agreement or the Agreement) setting out their respective interests and describing, among other things, the purpose, structure, and powers of Tivoli. Equity Partners was designated as Tivoli's Managing Member.

¶4 Although under the REPC the Victims were to be paid $750,000 as a down payment toward the purchase of the Property, once the Operating Agreement was signed, Defendants informed the Victims that they were not able to "come up with the money to make the purchase price and continue with [the] purchase agreement as it was." Defendants persuaded the Victims to put the Property up as collateral for a "hard-money loan" to "create some revenue" to begin development. Defendants then entered into a short-term, high-interest loan for the $750,000, which was secured by the Property. Approximately $350,000 of the $750,000 was used to pay off existing mortgages and taxes on the Property, and the remaining money was "put into a checking account ... for Tivoli Properties." This deposit constituted Tivoli's only operating funds and, according to the prosecution, was intended to fund the initial development, which primarily consisted of completing the

---

1. Judge Stephen L. Roth participated in this case as a member of the Utah Court of Appeals. He retired from the court before this decision issued. Senior Judge Pamela T. Greenwood sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

2. Although Bruun and Diderickson have separately appealed, their cases were tried together below and they have raised the same issues on appeal and submitted virtually identical briefing. Accordingly, we consolidated *State v. Bruun*, No. 20140295, and *State v. Diderickson*, No. 20140296, for purposes of this decision.

3. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly." *State v. Nay*, 2017 UT App 3, ¶2, 391 P.3d 367 (citation and internal quotation marks omitted).

4. The sole member of Equity Partners LLC was Four Winds; Defendants comprised two of the three members of Four Winds.

"entitlement" process through which the city of Saratoga Springs would approve the development of the Property. The Victims understood that once entitlement was obtained from Saratoga Springs, Tivoli would secure a construction loan with better terms to replace the hard-money loan and fund the actual development of the Property. In accordance with the Operating Agreement, the Victims began receiving monthly distributions from Tivoli's funds as this process went forward.

¶ 5 Unbeknownst to the Victims, Equity Partners entered into a joint venture agreement between Tivoli and Hidden Acres LLC, another of Defendants' companies, for development of property located in Centerville, Utah. The Victims were aware of a Hidden Acres project because Defendants had taken them to visit the property at one point, but they were not told that Tivoli had entered into an agreement to develop the Hidden Acres property, nor did they consent to it. In May 2008, Defendants informed the Victims that they were not able to pay the Victims their regular distributions. When asked why, Defendants responded with a "rough draft of what was spent on what" but they did not provide any receipts. The Victims then accessed the Tivoli account themselves and discovered that the remaining balance had been reduced to only $1,083. They reviewed the check-payment history over the previous six months and discovered that Defendants had spent thousands of dollars on expenses that appeared to be unrelated to the development of the Property. For example, there were several checks written to Four Winds for thousands of dollars in management fees; a check for more than $30,000 related to a lot closing at the Hidden Acres development; an earnest money check for purchase of another property; and payments for equipment, landscaping, and dump fees unrelated to the Property. Defendants had not sought the Victims' consent for any of these expenditures, nor were the Victims aware of them until their own investigation.

¶ 6 Around the time the Victims discovered the expenditures from the Tivoli capital account, they found out Tivoli had not made a single payment on the hard-money loan, which was then coming due. To keep the lender from foreclosing on the Property, Defendants asked the Victims to sign an agreement to increase the balance on the short-term loan by another $100,000. One of the Victims refused to sign and instead filed a notice of default in an attempt to get the Property back and to keep it from being auctioned by the hard-money lender.

¶ 7 In November 2008, the Victims and Defendants, along with Equity Partners, Four Winds, Tivoli, and other interested parties, entered into a settlement agreement (the Settlement). As part of the Settlement, the Victims received title to the Property and $174,000, which represented proceeds from the sale of .60 acres of the Property to the Utah Department of Transportation (UDOT). In return, the Victims paid $25,000 to Equity Partners and agreed to release that company from all claims related to its management of Tivoli.

¶ 8 About two and a half years later, in May 2011, the State charged Defendants with a number of criminal offenses related to their dealings with the Victims—twenty-eight counts of theft of varying degrees, targeting individual checks written from the Tivoli operating account, and one count of engaging in a pattern of unlawful activity.

¶ 9 Of central importance in the case was whether Defendants were authorized to make the expenditures represented in the checks. During preliminary hearing proceedings, Defendants argued that the Operating Agreement authorized the expenditures as a matter of law. The magistrate determined, however, that "believable evidence exists to support a conclusion that the checks were unauthorized" under the Operating Agreement and bound Defendants over on the charges.

¶ 10 At trial, Defendants repeated their argument that the Operating Agreement authorized the expenditures, and they note on appeal that "much of the trial was consumed with witnesses reading aloud, and then offering their interpretations of, various language of the Operating Agreement." Indeed, Defendants explained to the jury that the Operating Agreement was "the brains, ... the rules, ... the code book for how [members]

conduct [themselves]" and that the jurors would read the Agreement and see for themselves that the "purpose of [Tivoli] . . . wasn't just to do the entitlement on [the Property]." Bruun also testified that he believed Defendants were authorized to make the contested expenditures as well as enter into the Hidden Acres joint venture on the basis of their management authority under the Operating Agreement's terms. The State countered that "Tivoli Properties was established with the express purpose of developing [the Property]" and that Defendants spent "nearly a quarter million dollars" "for other purposes," such as "landscaping, dumping, [and] heavy equipment" unrelated to the Property, as well as "other real estate development projects that the Defendants had up in Davis County." The State elicited extensive testimony from the Victims regarding their understanding of particular provisions of the Operating Agreement relevant to the question of whether the disputed checks were authorized. The State also presented an expert forensic accountant, who opined that the Operating Agreement and other representations made during the parties' association did not authorize the majority of the expenditures at issue.

¶ 11 The trial court admitted the Operating Agreement as an exhibit at trial and provided it to the jurors to use, together with other evidence adduced at trial, to determine whether the various contested expenditures amounted to thefts. Defendants did not request that the court provide a jury instruction construing the Operating Agreement and did not object to the lack of any contract interpretation instructions.

¶ 12 Each of the twenty-eight counts of theft the State brought against Defendants related to individual checks drawn on the Tivoli account. For each of Defendants, the State voluntarily dismissed two counts during trial, and the jury returned not-guilty verdicts on fourteen counts and guilty verdicts on twelve counts. The checks the jury determined to be thefts all represented expenditures for development projects other

than the Property. For example, the jury determined that the lot closing payment and the equipment, landscaping, and dump fee expenditures were thefts. The jury also convicted Defendants on the one count of pattern of unlawful activity. As part of their sentences, the trial court ordered Defendants to jointly and severally pay restitution in an amount equal to the value of the checks the jury determined constituted thefts— $189,574.33.

¶ 13 Defendants appeal their convictions and the restitution order.

## ISSUES

¶ 14 Defendants raise five claims of error. First, they argue that the trial court should have determined as a matter of law that the Operating Agreement authorized Defendants' use of the funds in the Tivoli operating accounts for other development projects or, if the question of authorization was not clear as a matter of law, the court erred when it failed to instruct the jury regarding the Operating Agreement's provisions and effect. In the alternative, Defendants argue that their use of Tivoli's funds was authorized as a matter of law by relevant provisions of the Utah Revised Limited Liability Company Act, see Utah Code Ann. §§ 48-2c-101 to - 1902 (LexisNexis 2010),[5] and that the jury should have been instructed accordingly.

¶ 15 Second, Defendants argue that the trial court incorrectly interpreted the theft statute when it allowed the State to charge Defendants with theft of the full value of each of the twelve checks written on the Tivoli operating account rather than limiting the value of the thefts to the Victims' combined 25% interest in the company.

¶ 16 Third, Defendants argue that the trial court failed to instruct the jury on the lesser included offense of wrongful appropriation for each theft count.

¶ 17 Fourth, Defendants argue that the trial court failed to correctly instruct the jury that there was a minimum time frame required to establish a pattern of unlawful ac-

**5.** The Utah Revised Limited Liability Company Act Defendants rely upon was repealed and replaced effective January 1, 2016. However, its provisions were in effect at all times pertinent to the proceedings, and we cite them accordingly.

tivity and that, in any event, the maximum time period encompassing the offenses charged in this case—nine months—was insufficient as a matter of law to support Defendants' convictions.

¶ 18 Fifth, Defendants argue that, in determining restitution, the trial court failed to take into account the effect of the Settlement between Defendants and the Victims.

¶ 19 Finally, Defendants argue that we should reverse under the cumulative error doctrine.

## ANALYSIS

### I. Authorization Under the Operating Agreement and the LLC Act

¶ 20 Defendants were charged with multiple counts of theft under Utah Code section 76-6-404, which requires the State to prove that a defendant "obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." They were charged on the basis of certain checks they wrote from Tivoli's account for expenses that the State claimed were unrelated to development of the Property. Defendants acknowledged that the majority of the disputed checks on the Tivoli account went toward expenses related to Defendants' other development projects—in particular, the Hidden Acres development.

¶ 21 On appeal, Defendants argue that their convictions should be reversed because, as a matter of law, their actions "were expressly authorized by two sources that should have been interpreted, and applied, by the trial court"—the Operating Agreement and Utah's Revised Limited Liability Company Act (the LLC Act or the Act). They contend that the Operating Agreement's provisions—particularly those related to managerial powers—authorized them to enter into joint ventures and make expenditures unrelated to the Property's development, and that, on this basis, the court should have decided that their actions were authorized as

a matter of law. In the alternative, they contend that even if the Operating Agreement was ambiguous about the issue of authorization, the court should have sua sponte identified the precise nature of the ambiguity for the jury and appropriately instructed the jury regarding its role in interpreting the Operating Agreement. And although Defendants concede that the issue was not raised below, they argue that the LLC Act also authorized their actions as a matter of law and request that we review the issue under the doctrines of plain error, ineffective assistance of counsel, and manifest injustice. We first address whether the Operating Agreement authorized Defendants' actions and whether the court erred in not instructing the jury regarding contract interpretation. We then address whether the LLC Act authorized their actions.

### A. The Operating Agreement

¶ 22 Defendants argue that the question of whether their actions were authorized should have been decided by the court as a matter of law, not as a question of fact to be sent to the jury.[6] Certainly, if the Operating Agreement unambiguously authorized the expenditures for which Defendants were convicted, the theft counts would have been susceptible to dismissal by the court as a matter of law because the State could not have proved the "unauthorized control" element of the theft offenses. *See State v. Burton*, 800 P.2d 817, 819 (Utah Ct. App. 1990). In *Burton*, for example, we reversed the defendant's theft conviction because we determined that "[t]he terms of the contract underlying [the] transaction are unambiguous and create no express duty requiring Burton to pay over the sums received from [the alleged victim]." *Id.* And we noted in a later case that "we reversed Burton's theft conviction because there was no legal basis for finding that Burton exercised 'unauthorized control' over the funds paid by [the alleged victim] to Burton." *State v. Larsen*, 834 P.2d 586, 591 (Utah Ct. App. 1992). However, we deter-

---

**6.** We question whether this issue was preserved. We have had difficulty identifying in the voluminous record the point at which Defendants asked the court to decide this issue in the way they have presented it on appeal. Nevertheless, neither party has raised preservation as a barrier to our review of this issue, and we therefore address it on its merits, noting that the result is the same, regardless.

mined that the agreement at issue in *Larsen* could not be read to authorize the defendant in that case charged with theft of partnership property "to deal with partnership property as he wished." *Id.* We reasoned that, "[a]lthough the partnership agreement granted the general partners numerous powers," it "did not authorize defendant to deal with partnership property in a manner that he knew was not in the partnership's best interests." *Id.* We concluded that, as a consequence, "there was a legal basis for finding 'unauthorized control', and it was for the jury to decide whether a theft was committed." *Id.*; *cf. Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (explaining that, pursuant to the Sixth Amendment's right to trial by jury, "although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence").

¶ 23 Here, because the trial court sent the Operating Agreement to the jury along with all other evidence pertaining to the thefts charged, the court implicitly determined that the Operating Agreement's provisions were either ambiguous as to the element of authorization, *see Holladay Bank & Trust v. Gunnison Valley Bank*, 2014 UT App 17, ¶ 12, 319 P.3d 747 (explaining what constitutes ambiguity in a contract), or that the Agreement unambiguously did not allow Defendants' actions, *cf. Sullivan*, 508 U.S. at 277, 113 S.Ct. 2078. Either way, the court determined that it was proper for the jury to determine the element of authorization and that the case could not be dismissed on the basis of the Operating Agreement's provisions. *Cf. State v. Walker*, 2017 UT App 2, ¶ 24, 391 P.3d 380 (explaining that "a fact question, or a mixed question of law and fact, does not morph into a pure legal question for Sixth Amendment purposes merely because the evidence is overwhelming and might be characterized as supporting only one reasonable conclusion as a matter of law"). We conclude that the trial court did not err in submitting the issue of authorization to the jury. In particular, we are not persuaded by Defendants' argument that the Operating Agreement unambiguously authorized Defen-

dants' actions and that, as a result, the trial court ought to have decided the element of authorization in Defendants' favor as a matter of law and dismissed the theft charges against them.

¶ 24 "A contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent." *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 14, 48 P.3d 918 (citation and internal quotation marks omitted). Thus, it does not follow, as Defendants seem to contend, that contractual language pertinent to an element of a criminal charge must always be construed as a matter of law. Rather, as emphasized in *Burton*, "[w]e construe *unambiguous contracts* as a matter of law." 800 P.2d at 819 (emphasis added). "The underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract." *WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139. As a first step, "[w]e look to the writing itself to ascertain the parties' intentions, and we consider [e]ach contract provision ... in relation to all of the others, with a view toward giving effect to all and ignoring none." *Jones v. ERA Brokers Consol.*, 2000 UT 61, ¶ 12, 6 P.3d 1129 (second alteration and omission in original) (citation and internal quotation marks omitted). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *WebBank*, 2002 UT 88, ¶ 19, 54 P.3d 1139 (citation and internal quotation marks omitted). "However, if the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement," the contract's interpretation becomes a question of fact, and "extrinsic evidence must be looked to in order to determine the intentions of the parties." *See id.* (citation and internal quotation marks omitted). "A contract is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Holladay Bank & Trust*, 2014 UT App 17,

¶ 12, 319 P.3d 747 (citation and internal quotation marks omitted).

¶ 25 Among the major questions at trial related to the authorization element of the theft charges was whether the Operating Agreement limited Tivoli's activities—and hence its expenditures—solely to the Property. The State elicited testimony suggesting that, properly interpreted, the Agreement did just that, while Defendants contended that there was no such constraint. The Operating Agreement contains provisions that appear to support both sides of the question. For example, the Agreement's recitals explain that Tivoli was formed "to and for the sole purpose of investing in, purchasing, selling, granting, or taking an option on lands for investment purposes and/or development," a relatively expansive statement of the scope of Tivoli's business purpose. See Recital, Black's Law Dictionary (10th ed. 2014) (explaining that a recital is "[a] preliminary statement in a contract or deed explaining the reasons for entering into it or the background of the transaction"). Similarly, as Defendants point out, the "Business of the Company" section provides "an express limitation" on the nature of Tivoli's business and the managerial powers, stating that "the Company is intended to purchase and develop, hold and [sell] real estate for investment purposes only, and no activities inconsistent with such limited purposes shall be undertaken." Finally, the "Formation of Company" subsection similarly explains that "[t]he Company was formed as a new venture for the purpose of acquiring real property for development." These provisions are broad enough to suggest that the Operating Agreement could be read to authorize investments and expenditures on real estate development projects apart from the Property.

¶ 26 On the other hand, a number of provisions in the Operating Agreement appear to limit Tivoli's activities to the Property itself. In the definitions section, "Property" is defined as the "approximately 29 acres of real property located in Utah County, ... which real property is the subject of the Purchase Agreement," and "Developer" is defined as "Tivoli Properties, LLC, a Utah Limited Liability Company established to manage, improve, subdivide, develop, lease, and sell the Property and to perform all other activities reasonably related thereto." The "Purposes of the Company" subsection then explains that Tivoli "is organized for the purpose of carrying on the business of acquiring, managing, improving, subdividing, developing, leasing and selling the Property or any other enterprise that members *may mutually agree upon.*" (Emphasis added.) And although the "Business of the Company" provision considered in isolation is broadly written, it could reasonably be construed to incorporate the more specific "Purposes of the Company" provision to limit its breadth: "Equity Partners, LLC ... shall have full, exclusive and complete authority and discretion in the management and control of the business of the Company *for the purposes herein stated* ...." (Emphasis added.) Cf. *Nephi City v. Hansen,* 779 P.2d 673, 675 (Utah 1989) (explaining that, "where general terms follow specific ones, the rules of construction ... require that the general terms be given a meaning that is restricted to a sense analogous to the preceding specific terms"); *New York Ave. LLC v. Harrison,* 2016 UT App 240, ¶ 21, 391 P.3d 268 (explaining that we "interpret the contract as a whole, considering each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none" (brackets, ellipsis, citations, and internal quotation marks omitted)).

¶ 27 Thus, the Operating Agreement's descriptions of Tivoli's business purpose do not appear to clearly authorize Tivoli (or Equity Partners, on its behalf) to engage in real estate related activities apart from the Property itself. In fact, as the State argued below and on appeal, there appears to be a reasonable basis in the Agreement from which to conclude that, unless the members "mutually" agreed otherwise, Tivoli's authorized business activities were limited to development of only the Property. See *Holladay Bank & Trust,* 2014 UT App 17, ¶ 12, 319 P.3d 747. Accordingly, we conclude that the Operating Agreement did not unambiguously authorize joint ventures between Tivoli and other entities for investment in and development of property other than the Property.

¶ 28 A related issue at trial was whether Defendants had managerial authority to make the expenditures they did on Tivoli's behalf. Defendants argued that the broad powers the Operating Agreement gave to Tivoli's managers encompassed the contested expenditures, while the State argued that the Agreement curtailed the managers' authority to make those expenditures without consent of all the members—including the Victims. For example, Defendants argue that the "General Powers of Managers" subsection gave the managers authority to, among other things, "[p]urchase, lease, or otherwise acquire any real or personal property" as well as "[p]articipate with others in partnerships, joint ventures, and other associations and strategic alliances." However, they fail to acknowledge the caveat that managers may participate in such partnerships, joint ventures, associations, and alliances "only where same are directly in pursuit of the Business, as defined above," which seems arguably limited to development of the Property, as we have discussed. In addition, Defendants argue that the "Policies" subsection explains that in instances where the members do not agree "with reference to the policies to be followed by the company, the managing members shall have the right to decide what policy or policies shall be followed" and that their decision shall be considered "as final." And a section addressing "Conduct of the Company" provides that "[a]ny questions regarding the conduct of the Company business shall be determined by a vote of 100% of the Managing Members of the Company." Defendants contend that these management-related provisions allowed them broad latitude to extend Tivoli's business—and its capital expenditures—beyond the Property.

¶ 29 But the State contends that other sections of the Agreement significantly limit the managers' authority to take certain actions, and a reasonable argument can be made that several of those limitations apply to the expenditures and investments that underlay the theft counts on which the jury convicted. The "Limitations" on managers' powers subsection of the Operating Agreement provides that "no act shall be taken, sum expended, decision made, obligation incurred or power exercised by any Manager on behalf of the Company *except by the consent of One Hundred percent (100%) of all Membership Interests* with respect to" "[a]ny significant and material purchase, receipt, lease, exchange, or other acquisition of any real or personal property or business"; "[a]ny matter which could result in a change in the amount or character of the Company's capital"; "[t]he commission of any act which would make it impossible for the Company to carry on its ordinary business and affairs"; and "[a]ny act that would contravene any provision of the Articles or of this Operating Agreement." (Emphasis added.) These restraints can reasonably be interpreted to apply to Defendants' actions. As a result, given that the Operating Agreement's broad grant of authority to the company's managers is qualified by specific restraints, we are not persuaded that it unambiguously authorized Defendants to make the non-Property-related expenditures underlying the charges against Defendants.

■ ¶ 30 Thus, we conclude that the Operating Agreement did not unambiguously authorize Defendants to use Tivoli's capital for the expenditures that underlay the theft charges against them. Rather, while there are provisions in the Agreement from which the jury might reasonably have concluded that the parties intended Tivoli to engage broadly in real estate acquisition and development and that Defendants were authorized to engage in joint ventures and make the sorts of expenditures represented by the checks, there are also provisions reasonably supporting a conclusion that the parties intended Tivoli's business to be limited to development of the Property and that the Agreement limited the managers' ability to make the disputed purchases and payments. *See Holladay Bank & Trust v. Gunnison Valley Bank*, 2014 UT App 17, ¶ 12, 319 P.3d 747 ("A contract is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." (citation and internal quotation marks omitted)); *see also Daines v. Vincent*, 2008 UT 51, ¶ 29, 190 P.3d 1269 (explaining that when there is ambiguity, "contrary [contract] interpretations [are] reasonably supported by the

language of the contract" (citation and internal quotation marks omitted)). When a contract is "determined to be ambiguous in some respect[,] . . . the parties' intended meaning . . . [becomes] a question of fact to be determined by extrinsic evidence of intent." *Florence v. Colbert*, 2011 UT App 72, ¶ 2, 251 P.3d 246 (citation and internal quotation marks omitted).

¶ 31 And, as the State points out, the court could reasonably have determined that there was sufficient evidence to send the theft counts to the jury and let the jury decide whether the Operating Agreement's constraints on Tivoli's business and the managers' authority precluded Defendants from making the expenditures at issue. The parties presented extensive evidence on the meaning of the Operating Agreement during trial. As Defendants concede, "much of the trial was consumed with witnesses reading aloud, and then offering their interpretations of, various language in the Operating Agreement" regarding whether they had authority under the Agreement to make the expenditures at issue in the case. The State elicited testimony and argued that Defendants lacked authority to make the expenditures they were charged with, while Defendants attempted to demonstrate that under the Agreement they were not limited to making expenditures related only to the Property and that they had authority as managers to involve Tivoli in their other development projects and make the expenditures. As a result, the evidence presented at trial on the issue of whether the Operating Agreement authorized Defendants' actions was conflicting at best, but certainly not insufficient to submit to the jury for decision. For example, as the State argues, the jury could have decided that the dollar amount of some of the checks qualified them as "significant purchases" and that several of the larger checks were sufficiently "significant and material" to have resulted in "a change in the amount" of Tivoli's capital—both of which required the consent of all of Tivoli's members under the Operating Agreement. Similarly, the jury could have decided, based on the Operating Agreement's language and related testimony, that Tivoli's business was limited to activities related solely to the Property absent the "mutual agreement" of the members and that certain checks involving investments or expenditures in aid of other business ventures, such as Hidden Acres LLC, were contrary to the "Purposes of the Company" provision of the Operating Agreement. Thus, given the ambiguity of the Operating Agreement and substantial conflicting evidence about its meaning, we are not persuaded that the trial court was required to interpret the Operating Agreement to have authorized Defendants' conduct as a matter of law and dismiss the theft counts on that basis. *See State v. Clark*, 2001 UT 9, ¶ 13, 20 P.3d 300 ("We will uphold the trial court's decision to submit a case to the jury if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, the court concludes that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." (citation and internal quotation marks omitted)).

¶ 32 In sum, because we are not persuaded that the Operating Agreement unambiguously authorized Defendants' actions, the issue of whether Defendants were authorized to use Tivoli's capital as they did was properly submitted to the jury to decide based on the Agreement's language and the other evidence presented of the parties' intent. *Cf. State v. Larsen*, 834 P.2d 586, 591 (Utah Ct. App. 1992) (concluding that, because there was a legal basis for the jury to find that the defendant's actions were unauthorized based on the partnership agreement, "it was for the jury to decide whether a theft was committed").

### B. Jury Instructions

¶ 33 Defendants also argue that, even if the trial court did not err in sending the authorization question to the jury, it should have provided an instruction identifying each ambiguity in the Operating Agreement that the jury was required to resolve and advising that the parties' intent with regard to the managers' authority must be determined as of the time the Operating Agreement was entered into. This issue is unpreserved. Defendants did not request such an instruction in the trial court nor did

they ask the court to identify contractual ambiguities for the jury. "To preserve an issue for appeal, a party must present it to the trial court in such a way that the trial court has an opportunity to rule on that issue." *State v. Robinson*, 2014 UT App 114, ¶ 9, 327 P.3d 589 (citation and internal quotation marks omitted). In particular, "[u]nless a party objects to an instruction or the failure to give an instruction, the instruction may not be assigned as error except to avoid a manifest injustice." Utah R. Crim. P. 19(e). "When a defendant asserts an unpreserved jury instruction error on appeal on the basis that failure to review it would result in manifest injustice, we apply the same standard as we do for plain error review." *State v. Sellers*, 2011 UT App 38, ¶ 8, 248 P.3d 70. That is, the defendant must show that failure to so instruct was an obvious, prejudicial error. *See id.* In this regard, "relief is not available via the plain-error doctrine" unless Defendants persuade us that the error they allege is supported on the basis of settled law. *See Thomas v. Mattena*, 2017 UT App 81, ¶¶ 13–14, 397 P.3d 856; *see also State v. Roman*, 2015 UT App 183, ¶ 9, 356 P.3d 185 ("Thus, an error is not obvious if there is no settled appellate law to guide the trial court." (citation and internal quotation marks omitted)); *State v. Davis*, 2013 UT App 228, ¶ 32, 311 P.3d 538 (explaining that "[t]o establish that the error should have been obvious to the trial court, [the appellant] must show that the law governing the error was clear at the time the alleged error was made" (second alteration in original) (citation and internal quotation marks omitted)).

¶ 34 Defendants have not established that reversal under the plain error standard is appropriate. For instance, they claim that, in the event an agreement does not unambiguously authorize certain behavior in a criminal case, the trial court was required to affirmatively "identify the nature of the ambiguity" in the agreement for the jury. They claim the court could have done so by, for example, explaining uncertainties in specific provisions of the Operating Agreement or in the document as a whole. But the only case Defendants cite to support their contention, *Daines v. Vincent*, 2008 UT 51, 190 P.3d 1269, is a civil breach of contract case where the issue was whether the district court correctly directed a verdict on the basis that the plaintiff had previously signed a release of claims that unambiguously included the claims brought in the case. *Id.* ¶¶ 12–15, 18–19. The supreme court agreed with the district court that the release unambiguously released the defendants from the appellant's breach of contract claims. *Id.* ¶ 37. *Daines* did not address whether a court is required to identify the "nature of the ambiguity" in an agreement presented to a jury as evidence relating to the rights or obligations of a contracting party, whether in a civil or a criminal case, much less establish that failure to do so constitutes reversible error. And Defendants provide no other authority, such as case law or model instructions, to support their argument that the trial court was obviously required to instruct the jury on the particulars of any ambiguities in the Operating Agreement or about how to determine the parties' intent in the face of ambiguity. Instead, their analysis is limited to conclusory assertions that "[i]f the trial court found the Operating Agreement ambiguous, it would have needed to identify the nature of the ambiguity" and that "[o]nly after making these initial [ambiguity] determinations could the court meaningfully direct the jury as to its charge."

¶ 35 Accordingly, Defendants have failed to demonstrate that it would have been obvious to the trial court that it was required to instruct the jury on the nature of any ambiguity in the Operating Agreement or to specifically instruct the jury about how to determine the parties' intent from the Operating Agreement. *See Davis*, 2013 UT App 228, ¶ 32, 311 P.3d 538. Consequently, Defendants have failed to persuade us that failure to give such an instruction resulted in manifest injustice, as required by rule 19(e) of the Utah Rules of Criminal Procedure.

## C. The LLC Act.

¶ 36 Defendants argue in the alternative that, whatever constraints on their authority may have existed in the Operating Agreement, the LLC Act authorized as a matter of law their decisions to use Tivoli's funds to support or invest in other projects.

1. Preservation

¶ 37 The State contends that Defendants failed to preserve this argument in the trial court. "In order to preserve an issue for appeal, it must be specifically raised such that the issue is sufficiently raised to a level of consciousness before the trial court so as to give the trial court an opportunity to address the claimed error, and if appropriate, correct it." *State v. Noor*, 2012 UT App 187, ¶ 5, 283 P.3d 543 (brackets, citation, emphasis, ellipses, and internal quotation marks omitted). Defendants concede the accuracy of the State's assertion that trial counsel "did not specifically request the court to interpret the LLC Act" and in fact "did not mention [the LLC Act], ... let alone ask the trial court to apply it or to instruct the jury in accordance with its provisions." As a result, we agree with the State that questions regarding the interpretation of the LLC Act, which Defendants now raise on appeal, were not preserved. *See id.*

¶ 38 "To the extent that Defendant[s] did not preserve [their] claims before the trial court, [they] must establish plain error, ineffective assistance of counsel, or exceptional circumstances to warrant review by this court." *State v. Kozlov*, 2012 UT App 114, ¶ 28, 276 P.3d 1207. Defendants argue that we can review the issue under the plain error, ineffective assistance of counsel, and manifest injustice exceptions. It is unclear—and Defendants do not assist with any analysis on the issue—whether they believe that "manifest injustice" is an additional preservation exception applicable here. In any event, as a general rule, "[m]anifest injustice is synonymous with the plain error standard." *State v. Cox*, 2012 UT App 234, ¶ 2, 286 P.3d 15 (citation and internal quotation marks omitted). "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful ...." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (brackets, citation, and internal quotation marks omitted). As explained above, to succeed on plain error review, Defendants must demonstrate that the error they allege is supported on the basis of settled law. *See State v. Davis*, 2013 UT App

228, ¶ 32, 311 P.3d 538 (explaining that "an error is not obvious if there is no settled appellate law to guide the trial court" (citation and internal quotation marks omitted)).

¶ 39 "With respect to any ineffectiveness claim, a defendant must first demonstrate that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment. Second, the defendant must show that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citation omitted). "[W]e presume that counsel has rendered adequate assistance," *State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993) (citing *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), and "[t]o establish a claim of ineffectiveness based on an oversight or misreading of law, a defendant bears the burden of demonstrating why, on the basis of the law in effect at the time of trial, his or her trial counsel's performance was deficient," *State v. Edgar*, 2017 UT App 53, ¶ 10, 397 P.3d 670 (citation and internal quotation marks omitted); *id.* ¶¶ 16, 18 (concluding that counsel was not deficient for failing to file a motion "based on an unresolved proposition of law" and for which "[t]he law on [the] issue [was] not settled in Utah"). In this regard, plain error and ineffective assistance of counsel are similar—an appellant cannot prevail under either standard if he or she is unable to show that settled law supports the claims of legal error. *Compare Edgar*, 2017 UT App 53, ¶¶ 10, 16, 18, 397 P.3d 670, *with Davis*, 2013 UT App 228, ¶ 32, 311 P.3d 538. And Defendants must demonstrate all of the elements under either plain error or ineffective assistance to prevail on either claim on appeal. *See Dunn*, 850 P.2d at 1209 (plain error); *McCamey v. State*, 2017 UT App 97, ¶ 11, 400 P.3d 1114 (ineffective assistance of counsel).

¶ 40 As we explain below, we are not persuaded that it would have been obvious to the trial court or counsel that the LLC Act dictated a different result in this case.

## 2. The LLC Act's Provisions

■ ¶ 41 Defendants' arguments with respect to application of the LLC Act rest on their claim that they owned effectively 75% of Tivoli through their ownership interest in Equity Partners. They contend that the LLC Act authorized their use of Tivoli's operating capital to make expenditures related to the Hidden Acres development because the LLC Act permits owners of more than two-thirds of the interests in a limited liability company to act with "extremely broad authority—even to take actions in contravention to the operating agreement or the stated purpose of the LLC."

■ ¶ 42 "When we interpret statutes, our primary goal is to give effect to the legislature's intent in light of the purpose the statute was meant to achieve." *Evans v. State*, 963 P.2d 177, 184 (Utah 1998). "[W]e first look to the plain language of the statute and give effect to that language unless it is ambiguous." *State v. Jeffries*, 2009 UT 57, ¶ 7, 217 P.3d 265. Like contracts, statutory language is ambiguous if "its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 15, 267 P.3d 863. Because we are reviewing this issue for plain error and ineffective assistance, for Defendants to prevail on appeal, they must persuade us that the statutory provisions unambiguously authorized Defendants' actions as a matter of law. Otherwise, we cannot conclude that the law on this issue was sufficiently settled to give rise to claims of plain error or ineffective assistance of counsel. *See Edgar*, 2017 UT App 53, ¶¶ 10, 16, 18, 397 P.3d 670 (ineffective assistance of counsel); *Davis*, 2013 UT App 228, ¶ 32, 311 P.3d 538 (plain error). We are not persuaded that the LLC Act clearly authorized Defendants' actions.

■ ¶ 43 The LLC Act "establish[es] the duties and powers of a limited liability company." *See CCD, LC v. Millsap*, 2005 UT 42, ¶ 23, 116 P.3d 366. In doing so, the Act addresses everything from formation, governance of members, management and distributions, to dissolution, winding up, and conversions and mergers. *See* Utah Code Ann. §§ 48-2c-101 to -1902 (LexisNexis 2010). However, the LLC Act does not comprehensively prescribe every detail of company management. Rather, the legislature stated its intent that the Act "be interpreted so as to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements of companies." *Id.* § 48-2c-1901. To give this principle meaningful effect, the LLC Act gives the members of an LLC broad authority to adapt a number of the Act's core provisions to meet their particular governance needs:

> [A]n operating agreement may modify the rules of any provision of this chapter that relates to: (a) the management of the company; (b) the business or purpose of the company; (c) the conduct of the company's affairs; or (d) the rights, duties, powers, and qualifications of, and relations between and among, the members, the managers, the members' assignees and transferees, and the company.

*Id.* § 48-2c-502(1). This flexible approach is directly reflected in the provisions of the Act most pertinent to this appeal, found in the part dedicated to "Management." Indeed, nearly every section describing management roles, duties, and operations includes the proviso that the stated rules apply "unless otherwise provided in the articles of organization or operating agreement." *E.g.*, *id.* §§ 48-2c-801(2), -803, -803.1, -804(6), -805, -807(3), -808. In this regard, we have recognized that "[u]nder the LLC Act, members of an LLC are allowed great flexibility when choosing how the LLC will be organized and managed," with "the provisions of the LLC Act serv[ing] as default provisions that govern an LLC if its members do not include contrary language in their operating agreement or in the LLC's articles of organization." *OLP, LLC v. Burningham*, 2008 UT App 173, ¶ 18, 185 P.3d 1138; *see also Duke v. Graham*, 2007 UT 31, ¶ 19, 158 P.3d 540 ("In short, the LLC Act grants broad authority to the members of an LLC to override its default provisions relating to the management of the company through recognizing the specific terms contained in a company's operating agreement ...." (internal quotation marks omitted)); *DePatco, Inc. v. Teton View Golf Es-*

*tates, LLC*, 2014 UT App 266, ¶ 11, 339 P.3d 126 (explaining that the LLC Act "contemplates that operating agreements may alter various 'default' provisions").

¶ 44 Nonetheless, Defendants point to several subsections which they contend, read together, authorized them to "enter into the [Hidden Acres] joint venture" and to use Tivoli's money to make expenditures for other development projects. First, they look to section 48-2c-804, titled "Management by managers." This section defines the role of a manager under the LLC Act and describes the actions a manager is authorized to take on behalf of a company. Defendants focus specifically on two subsections. Subsection (4) provides that "no manager shall have authority to do any act in contravention of the articles of organization or the operating agreement, except as provided in Subsection (6)(g)." Subsection (6)(g) provides that "unless otherwise provided in the articles of organization or operating agreement of the company: (g) approval by: ... (ii) members holding 2/3 of the profits interests in the company, and 2/3 of the managers shall be required for all matters described in Subsection 48-2c-803(3)." Defendants claim that they qualify under this subsection because they owned or controlled more than two-thirds of the membership interests in Tivoli. Subsection 803(3) in turn identifies a list of actions that may be taken if 2/3 of the members vote, approve, or consent, including,

> (a)(i) authorizing a member or any other person to do any act on behalf of the company that is not in the ordinary course of the company's business, or business of the kind carried on by the company; ... (c) resolving any dispute connected with the usual and regular course of the company's business; [and] (d) making a substantial change in the business purpose of the company.

Utah Code Ann. § 48-2c-803(3) (LexisNexis 2010). Defendants contend that these sections together are dispositive on the issue of their authorization to act as they did with Tivoli's capital because Defendants "undisputedly held a greater than two-thirds profits interest in Tivoli," which meant they were statutorily authorized to "enter into the [Hidden Acres] joint venture and expend Tivoli funds on the Hidden Acres development, regardless of any allegation that it was in contravention of the Operating Agreement or not in the course of Tivoli's regular business."

¶ 45 In response, the State contends that, even if Defendants held a two-thirds interest in Tivoli, the statute did not authorize Defendants' contested actions. The State asserts that the Operating Agreement's requirement for consent of all the owners for the managers' actions taken outside the scope of the company's business or in contravention of the Agreement's specific requirements overrode what amounted only to statutory default provisions permitting a two-thirds membership majority to avoid the business constraints of an operating agreement. The State argues that, although subsection (6)(g), taken out of context, may be read to permit members holding two-thirds or more interest to exercise powers described in subsection 803(3), subsection (6) itself—and therefore each of its subsections—begins with the proviso, "unless otherwise provided in the articles of organization or operating agreement of the company." The State notes that the Operating Agreement expressly requires "consent of One Hundred percent (100%) of all Membership Interests" for "[a]ny amendment or restatement" of the Operating Agreement; "[a]ny change in the character of the business and affairs of the Company," "[a]ny significant and material purchase," and the "commission of any act which would make it impossible for the Company to carry on its ordinary business and affairs." And, the State argues, the thefts charged against Defendants involved just this sort of prohibited management conduct.

¶ 46 Defendants respond, however, that the most logical interpretation of subsection 804(4)'s proviso, excepting management actions described in subsection 804(6)(g) from the constraints of an operating agreement, requires that subsection 804(6)'s prefatory proviso, that the actions may be taken "unless otherwise provided in ... the operating agreement," not apply once subsection 804(4) has been invoked. Defendants argue that "[t]he only reasonable meaning of Section 804(4) is that, when it mentioned 804(6)(g),

that is what it meant—(6)(*g*)" alone, without the prefatory language of subsection (6). Defendants claim that, otherwise, subsection 804(4) "could never be triggered" if the 806(6) prefatory proviso applies, because "a manager could never act in contravention of an operating agreement"; as a matter of simple logic, "if the action is in contravention of the operating agreement, that means the operating agreement 'otherwise provides' some prohibition against the action." Defendants also argue that the State's contrary interpretation is "not only circular but inconsistent with the actual wording and purpose of the statute," where the "Act is intended to afford flexibility to LLC members" and one way to achieve this "is to permit those with the biggest stakes ... in conjunction with those who have been given management authority to take actions in a more flexible and timely manner," a description they claim perfectly fits Defendants.

¶ 47 We acknowledge that there is some logic to Defendants' interpretation, and their argument illuminates a potential inconsistency in the statute if subsection 804(6)'s introductory proviso is included when subsection 804(4) is invoked. But it is certainly not obvious that 804(4) is meant to incorporate 804(6)(g) without 804(6)'s broad qualification giving primacy to contrary provisions of an operating agreement, especially in light of the LLC Act's overarching policy elevating the specific agreements of a company's members over the default provisions of the Act. And we are not convinced that an interpretation which includes the (6)(g) proviso necessarily renders subsection 804(4) a nullity, as Defendants contend. But even assuming that it would, Defendants essentially ask us to narrowly employ the "canon of independent meaning" in a manner and under circumstances that obviously undercut the relevant underlying policy in the LLC Act to give "maximum effect" to "freedom of contract and to the enforceability of operating agreements of companies" in areas of management authority that seem crucial to the protection of minority members from the will of the majority. *See* Utah Code Ann. § 48-2c-1901 (LexisNexis 2010); *Lancer Ins. Co. v. Lake Shore Motor Coach Lines, Inc.*, 2017 UT 8, ¶ 13, 391 P.3d 218 (explaining that the canon

of independent meaning "expresses ... a reluctance to attribute to the legislature the intent to adopt a nullity," and "presumes that each provision of a statute has meaning independent of all others"). Our supreme court has explained in the context of interpreting the LLC Act that this is something courts ought to avoid.

¶ 48 In *CCD, LC v. Millsap*, 2005 UT 42, 116 P.3d 366, our supreme court explained that we should "construe the meaning of the [LLC Act] in a manner consonant with its policy objectives" and avoid a "bare mechanical" plain language reading that "strips away from its text all policy considerations" that would instead favor "an artificial construction unrelated to the Act's purpose." *Id.* ¶¶ 20, 25. The appellant in *Millsap* argued that a plain language reading of the Act mandated that the LLC could not expel him because the LLC's operating agreement permitted a member to withdraw by retiring and, at the time the LLC attempted to expel him, "he had retired and was no longer a member." *Id.* ¶¶ 17–20. The supreme court noted that the appellant's argument "neatly reduce[d]" to a syllogism—under a plain language reading of the LLC Act, "only members of limited liability companies may be expelled; [the appellant] was not a member; therefore, [the appellant] could not be expelled." *Id.* ¶ 19. But the court explained that "[t]here exists ... no legal principle that requires legislative enactments to be leashed to Aristotelian logic" and that, while, "in the abstract ... [the appellant's] syllogism is unassailable," "when placed in the context of applying a statute assigned the task of regulating the formation and operation of limited liability companies, that syllogism becomes starkly artificial and irrelevant." *Id.* The court explained that "the Act takes pains to preserve the statutory expulsion provisions against erosion through the terms of operating agreements" and that the appellant's reading would "sanction[ ] by indirection what the Act directly prohibits." *Id.* ¶ 24. The court accordingly declined to adopt the appellant's "protracted" plain-language reading and instead adopted a reading of the LLC Act that was "consonant with its policy objectives," which it determined com-

pelled the result that the Act authorized the appellant's expulsion. *Id.* ¶¶ 21, 25.

¶ 49 Here, even if, "in the abstract" Defendants' plain language reading makes some sense, "when placed in the context of applying a statute" that "takes pains to preserve" freedom of contract in the areas of company management, changes in business purpose, company conduct, and the allocation of rights and powers as between managers and members, Defendants' reading contravenes the stated intent and the relevant overall policy of the Act. Certainly the isolated provisions of the Act relied on by Defendants on appeal do not legally settle the question of whether at the time of trial Defendants had authority to act as they did, especially given the Act's express policy and provisions aimed at giving primacy to the parties' own agreements over otherwise contrary "default" provisions of the LLC Act itself.

¶ 50 And Defendants' assertions in this regard are even less persuasive given that the result they urge—that provisions of the LLC Act must be read to invalidate significant management constraints in the Operating Agreement—appears to contradict the terms of the Operating Agreement itself, which echoes the notion that the provisions of the LLC Act operate only as a default where the Operating Agreement itself does not address the subject: "The rights and obligations of the Members shall be as set forth in the [LLC] Act *unless* the Articles or this Agreement expressly provide otherwise, in which case the provisions of the Articles or this Agreement shall control." (Emphasis added.)

¶ 51 Accordingly, because the provisions of the LLC Act that Defendants rely on do not obviously authorize them to act in contravention of relevant provisions of the Operating Agreement, we are not persuaded that the trial court committed plain error by sending the case to the jury on the theft element of authorization in the face of settled law exonerating them or that trial counsel performed deficiently by failing to make the arguments with respect to the LLC Act that Defendants have now made on appeal. *See State v. Edgar*, 2017 UT App 53, ¶ 16, 397 P.3d 670 (explaining that an appellant must demonstrate that the law in effect at the time of

trial supports his position in order to demonstrate deficient performance); *State v. Bell*, 2016 UT App 157, ¶ 8, 380 P.3d 11 ("Plain error requires obvious, prejudicial error."); *see also State v. Saunders*, 893 P.2d 584, 591–92 (Utah Ct. App. 1995) (explaining that as a general rule alleged errors that are not obvious to the trial court will also not be obvious to counsel), *rev'd on other grounds*, 1999 UT 59, 992 P.2d 951.

## II. Percentage of Profits

¶ 52 Defendants next argue that the trial court should have instructed the jury that because Defendants "owned all but 25 percent of the allegedly stolen LLC funds," "the value of the allegedly stolen property was not more than 25 percent of the checks at issue." They contend that had the jury been properly instructed, all but four counts would have been dismissed, because the rest would have been reduced from the charged felonies to misdemeanors and would therefore "have been subject to dismissal based upon the two-year statute of limitations" applicable to misdemeanor theft. *See* Utah Code Ann. § 76-1-302(1)(b) (LexisNexis 2012) (providing that "a prosecution for … a misdemeanor … shall be commenced within two years after it is committed"); *see also id.* § 76-6-412(c), (d) (explaining the classifications of misdemeanor theft).

¶ 53 The State responds that, under Utah law, "[i]t is no defense [under the theft statute] that the actor has an interest in the property or service stolen if another person also has an interest that the actor is not entitled to infringe." Utah Code Ann. § 76-6-402(2) (LexisNexis 2012). The State argues that, as a result, the Victims' fractional interest in Tivoli did not provide Defendants with a value-based defense to the theft charges. The State also points out that, even if Defendants' ownership interest could provide a defense, it could not do so here, where Defendants' own "interest was in Tivoli," a "legal entity distinct from its members" and they accordingly had no direct interest in Tivoli's assets. We agree with the State.

¶ 54 Defendants' argument essentially presents "an issue of statutory construc-

tion that we review for correctness, according no particular deference to the trial court." *State v. Hawker*, 2016 UT App 123, ¶ 5, 374 P.3d 1085 (citation and internal quotation marks omitted). Utah Code section 76-6-402 expressly provides that it is not a defense to theft that the accused owned some interest in the stolen property "if another person also has an interest that the actor is not entitled to infringe." We have applied this statute in circumstances analogous to this case. For example, in *State v. Larsen*, 834 P.2d 586 (Utah Ct. App. 1992), the defendant argued that the theft charges against him were precluded because of his ownership interest as a partner in the partnership whose assets he was accused of stealing. *Id.* at 590. Citing Utah Code sections 76-6-402(2) and 404, we explained that Utah has abandoned by statute the common law theory that partners "cannot misappropriate what is already theirs." *Id.* Defendants' argument here is essentially the same as Larsen's—they cannot be convicted of stealing what they already own by virtue of their 75% ownership interest in Tivoli.[7]

¶ 55 And, as the State points out, both the LLC Act and the Operating Agreement undermine Defendants' argument that the value of any theft they may have committed must be reduced by any ownership interest they have in Tivoli. According to the Act, an LLC "is a legal entity distinct from its members." Utah Code Ann. § 48-2c-104 (LexisNexis 2010). Even if a "member" of an LLC (in this case, Equity Partners) has "an ownership interest" in the LLC, *id.* § 48-2c-102(14), "[that] member has no interest in specific property of [the] company," *id.* § 48-2c-701(2). Thus, under the LLC Act, Defendants' ownership of 75% of Tivoli did not entitle them to 75% of the company's specific property—in this case, the operating capi-

tal—to do with as they chose. The Operating Agreement provides similarly. For example, the definitions section of the Agreement expressly defines "Membership Interest" as "a Member's percentage interest in the Company, consisting of the Member's right to share in Profits, receive distributions, participate in the Company's governance, approve the Company's acts, participate in the designation and removal of a Manager, and receive information pertaining to the Company's affairs." Thus, by definition, the members' interests create proportional rights to profits, distributions, and participation rights, not a right to access and use the company's operating capital. And the Agreement expressly states that the $750,000 procured by Equity Partners through the hard-money loan—the source of the money that Defendants were convicted of stealing—"will be used as operating capital for the Company." *See State v. Stites*, 5 Utah 2d 101, 297 P.2d 227, 229 (1956) (upholding a conviction of misapplication of corporate funds even when the accused shareholder "owned all but four shares of the stock" in a corporation, reasoning that "[s]o long as the corporation is an entity and owns the money, and that money is withheld or taken and used for non-corporate purposes, ... there is no escape from the conclusion that there has been a wrongful and intentional misapplication of corporate funds").

¶ 56 Defendants' reliance on *State v. Parker*, 104 Utah 23, 137 P.2d 626 (1943), to support their argument that the value of the thefts should have been limited to the Victims' interest in Tivoli's funds is misplaced. *Parker's* holding is limited to the proposition that a bailor can be charged with theft of his own property if he takes that property from a bailee who maintains a security interest—a lien—in the property.[8] *Id.* at 628–30. And

7. We note that, even assuming that Defendants could limit the value of the stolen money according to their fractional ownership interest in Tivoli, the convoluted nature of Defendants' ownership interests seems to limit the applicability of this defense in the circumstances here. For example, the members of Tivoli are Equity Partners, 75%, and both of the Victims, collectively 25%. But Equity Partners itself is composed of only one member—Four Winds, another LLC. And, as noted above, Four Winds is comprised of

three members, of which only two are Defendants. Thus, even according to Defendants' own argument, it is not clear how Defendants, acting as individuals, could be said to own a clear 75% interest in Tivoli given the stacked LLCs involved in Tivoli's ownership.

8. "Bailment" is "[a] delivery of personal property by one person (the bailor) to another (the bailee) who holds the property for a certain purpose, usually under an express or implied-in-fact

although the concurrences in that case suggested that the value of the thefts should have been limited to the amount of the security interest rather than the full value of the property and that the jury ought to have been so instructed, *see id.* at 631 (Wolfe, J., concurring); *id.* at 633 (McDonough, J., concurring); *id.* at 634 (Wade, J., concurring), as Defendants concede, "the adequacy of the jury instructions was not raised by the parties" in the case. In any event, Defendants fail to explain why their situation—i.e., individuals with an attenuated equity interest in Tivoli through membership in a chain of other LLCs—is comparable to a common law bailor–bailee relationship, where the bailor is the direct owner of the bailed property.

¶ 57 Accordingly, we are not persuaded that the trial court erred when it failed to instruct the jury that the value of the thefts was limited in proportion to Defendants' ownership interests in Tivoli or that certain of the charged thefts ought to have been dismissed on that basis.

### III.  Lesser Included Offense

¶ 58 Defendants argue that their convictions "should be reversed for [the trial court's] failure to instruct on the lesser-included offense of wrongful appropriation."[9] Defendants concede that this issue is unpreserved, as trial counsel affirmatively "forewent an instruction on the lesser included offense of misappropriation." They therefore raise the issue under the doctrines of manifest injustice and ineffective assistance of counsel. In particular, they contend that their attorneys either (1) "reasonably believed there was a stipulation with the State on which [they] relied in foregoing the instruction, and on which the State later reneged," or (2) "unreasonably believed there was a stipulation with the State." If Defendants' counsel reasonably believed that there was a stipulation, then they contend that our review of this issue "is necessary to prevent manifest injustice." And if counsel unreason-

ably believed there was a stipulation, then "that unreasonable action . . . fell below an objective standard of reasonable professional judgment." Either way, they contend, "a new trial is required."

¶ 59 "When a claim of error regarding a jury instruction is made for the first time on appeal, appellate courts review the instruction for manifest injustice" under Utah Rule of Criminal Procedure 19(e). *State v. Cox*, 2012 UT App 234, ¶ 2, 286 P.3d 15 (internal quotation marks omitted). In this context, the manifest injustice exception is "synonymous with the plain error standard." *See id.* (citation and internal quotation marks omitted). In any event, here, Defendants' trial counsel affirmatively withdrew a request for a wrongful appropriation instruction. Under the doctrine of invited error, "where a party makes an affirmative representation encouraging the court to proceed without further consideration of an issue, an appellate court need not consider the party's objection to that action on appeal." *State v. Moa*, 2012 UT 28, ¶ 27, 282 P.3d 985; *see also State v. Alfatlawi*, 2006 UT App 511, ¶ 26, 153 P.3d 804 (explaining that when an error is invited, "a party on appeal cannot take advantage of [that] error committed at trial when that party led the trial court into committing the error" (citation and internal quotation marks omitted)). The doctrine of invited error precludes review under even the manifest injustice exception. *See State v. Cooper*, 2011 UT App 234, ¶¶ 8–9, 20, 261 P.3d 653. Therefore, regardless of whether trial counsel reasonably believed that a stipulation had been made with the State, by withdrawing the request for the lesser included offense instruction, counsel provided the trial court an "affirmative representation [that] led the district court to commit the error that [Defendants] now challenge[ ] on appeal." *See Moa*, 2012 UT 28, ¶ 31, 282 P.3d 985. Accordingly, we decline to review this issue under manifest injustice.

---

contract. Unlike a sale or gift of personal property, a bailment involves a change in possession but not in title." *Bailment*, Black's Law Dictionary (10th ed. 2014).

9.  Utah Code section 76-6-404.5 provides that "[w]rongful appropriation is a lesser included offense of the offense of theft" and that it is "punishable one degree lower than theft." Utah Code Ann. § 76-6-404.5(3), (4) (LexisNexis 2012).

¶ 60 While invited error precludes us from reaching the jury instruction issue under manifest injustice, it does not preclude us from reaching the issue under a claim for ineffective assistance of counsel. *See State v. McNeil*, 2013 UT App 134, ¶ 25, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699. To demonstrate ineffective assistance of counsel, "a defendant must show, first, that his counsel rendered deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment and, second, that counsel's performance prejudiced defendant." *State v. Bedell*, 2014 UT 1, ¶ 20, 322 P.3d 697 (citation and internal quotation marks omitted). "[B]oth prongs of the [ineffective assistance of counsel test] must be met," and "we need not address both components of the inquiry if the defendant makes an insufficient showing on one." *State v. Arriaga*, 2012 UT App 295, ¶ 12, 288 P.3d 588 (citation and internal quotation marks omitted).

¶ 61 Defendants argue that trial counsel's decision to forgo the lesser included offense instruction because of a perceived stipulation with the State fell below the "objective standard of reasonable professional judgment." Specifically, Defendants argue that trial counsel's belief that the State had agreed to a favorable post-verdict process was unreasonable. But an appellate court reviewing trial counsel's actions for ineffective assistance does not have to accept at face value the explanation appellant provides for the challenged decision. *See Jackson v. State*, 2015 UT App 217, ¶ 19, 359 P.3d 659 (explaining that "our consideration of counsel's performance does not depend on counsel's subjective state of mind" (citation and internal quotation marks omitted)). Instead, "we focus on the objective reasonableness of counsel's performance." *Id.* (citation and internal quotation marks omitted); *see also State v. Christensen*, 2014 UT App 166, ¶ 23, 331 P.3d 1128 (explaining that "we must presume that counsel had a legitimate reason for his choices where a plausible explanation for his choices can be posited"). The question for our review is whether "a reasonable, competent lawyer *could have* chosen the strategy that was employed in the real-time context of trial." *State v. Barela*, 2015 UT 22, ¶ 21, 349 P.3d 676 (emphasis added); *see also State v. Tennyson*, 850 P.2d 461, 468 (Utah Ct. App. 1993) ("Given *Strickland*'s strong presumption of competence, we need not come to a conclusion that counsel, in fact, had a specific strategy in mind. Instead, we need only articulate some plausible strategic explanation for counsel's behavior." (citation omitted)).

¶ 62 Here, we agree with the State that there was a plausible basis for counsel's decision not to request a lesser included offense instruction. For example, as the State suggests, trial counsel could have decided to forgo a lesser included offense instruction as part of an "'all or nothing' defense theory, i.e., that [Defendants were] totally innocent of *any* wrongdoing." *State v. Dyer*, 671 P.2d 142, 145 (Utah 1983); *see also State v. Feldmiller*, 2013 UT App 275, ¶¶ 3–4, 316 P.3d 991 (per curiam) (concluding that it was not ineffective assistance for trial counsel to withdraw a request for a manslaughter instruction in a murder case where defense counsel pursued an "all or nothing" strategy). Here, pursuing the "all or nothing" strategy could have resulted in an acquittal. *See State v. Campos*, 2013 UT App 213, ¶ 36, 309 P.3d 1160 (discerning no ineffective assistance where counsel pursued "one middle-ground defense and [chose] to forego another," because, had the strategy prevailed, the defendant "would have been entitled to acquittal"). And, as the State points out, the burden of even misdemeanor criminal convictions could have impaired future business opportunities for defendants such as these, with otherwise clean criminal records. Similarly, counsel could have concluded that a lesser included offense strategy would have been inconsistent with, and accordingly weaken, Defendants' claim that they were completely innocent of theft. *Cf. id.* (concluding that counsel's decision to "forego another [defense] that was arguably inconsistent with [the defendant's] version of the events" was not per se unreasonable trial strategy).

¶ 63 Under these circumstances, we are not persuaded that Defendants' trial counsel performed deficiently. And because Defendants have not shown that their trial counsel performed deficiently, we do not address whether counsel's strategy prejudiced Defen-

dants. *See Arriaga*, 2012 UT App 295, ¶ 12, 288 P.3d 588.

## IV. Pattern of Unlawful Activity

¶ 64 Defendants next argue that their convictions for engaging in a pattern of unlawful activity should be dismissed because their actions took place over a period of less than a year, a time frame they contend was insufficient as a matter of law to constitute a "pattern" under the Utah Pattern of Unlawful Activity Act (the UPUAA). They point out that the supreme court held in *Hill v. Estate of Allred*, 2009 UT 28, 216 P.3d 929, that the "series of related predicates" which may constitute a pattern of unlawful activity under the UPUAA must extend "over a substantial period of time" or that there must be "a demonstrated threat of continuing unlawful activity." *Id.* ¶ 41. Recognizing that "the Utah Supreme Court has not had occasion to decide what constitutes a 'substantial period of time' under *Hill*," Defendants nonetheless argue that, based upon RICO law, the federal analogue to the UPUAA, the period of less than nine months in which Defendants wrote the checks underlying the pattern of unlawful activity charges cannot constitute a "substantial period of time." And they contend that we should rely on federal RICO law to determine that "the UPUAA imposes a minimum threshold of at least one year to allege closed continuity," because the supreme court has looked to federal RICO law in the past to interpret the UPUAA and federal RICO law establishes that a "substantial period of time" must be more than one year.

¶ 65 Alternatively, they contend that their convictions should be reversed because the jury was not adequately instructed regarding the temporal element of "continuing unlawful conduct." Again relying on *Hill*, they argue that the jury was not instructed, as it should have been, that it could find a pattern of unlawful activity had occurred under the UPUAA only if it extended over a substantial period of time. And characterizing the "substantial period of time" part of the test as a "key requirement," they assert that the failure to so instruct the jury requires reversal of their UPUAA convictions.

¶ 66 Defendants concede that trial counsel did not seek dismissal of the UPUAA counts or request a jury instruction containing a "substantial period of time" element. Thus, their arguments on this issue are not preserved. Nonetheless, they assert that we should review their claims under ineffective assistance of counsel, plain error, and manifest injustice.

¶ 67 As previously discussed, to sustain a claim that Defendants received ineffective assistance of trial counsel, Defendants must show that their counsel's performance "was both deficient and prejudicial." *State v. Cox*, 2012 UT App 234, ¶ 2, 286 P.3d 15. To demonstrate that the court plainly erred, they must show that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful—i.e., absent the error there is a reasonable likelihood of a more favorable outcome." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (brackets, citation, and internal quotation marks omitted). "To prevail on appeal, [Defendants] must establish all the elements of either test." *See Cox*, 2012 UT App 234, ¶ 2, 286 P.3d 15. Under either ineffective assistance or plain error, the test for prejudice is the same—a reasonable likelihood of a more favorable outcome. *See State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699. And manifest injustice in the context of jury instruction claims is usually "synonymous with the plain error standard." *State v. Cooper*, 2011 UT App 234, ¶ 8, 261 P.3d 653 (citation and internal quotation marks omitted).

¶ 68 Defendants contend that their trial counsel was ineffective for failing to move for dismissal of the pattern of unlawful activity counts, contending that the "UPUAA imposes a minimum threshold of at least one year" to establish an actionable pattern of unlawful activity and that the facts in their case show that, at most, the predicate acts occurred only over a nine-month period. Because the claim of ineffectiveness is "based on an [asserted] oversight or misreading of law, [Defendants] bear the burden of demonstrating why, on the basis of the law in effect at the time of trial, [their] counsel's performance was deficient." *See State v. Dunn*, 850 P.2d 1201, 1228 (Utah 1993); *accord State v. Ed-*

*gar*, 2017 UT App 53, ¶ 10, 397 P.3d 670. Similarly, counsel is not ineffective for failing to advance a theory or interpretation of the law which has not yet been settled or ruled upon by our courts. *See State v. Love*, 2014 UT App 175, ¶ 7, 332 P.3d 383 (explaining that counsel "cannot be faulted for failing to advance a novel legal theory which has never been accepted by the pertinent courts" (citation and internal quotation marks omitted)). In this respect, as we have noted above, the requirements to establish plain error and ineffective assistance of counsel are substantially the same—that is, it is not ineffective assistance of counsel or plain error for the court or counsel to fail to take some action on the basis of unsettled law. *Compare id.*, *with State v. Roman*, 2015 UT App 183, ¶¶ 10–11, 356 P.3d 185 (explaining that an appellant cannot successfully "invoke the plain error exception to our preservation rules" if he or she is unable to demonstrate that there is "settled appellate law" governing the alleged legal error).

¶ 69 Here, Defendants have not demonstrated that their trial counsel's performance was deficient for failing to move to dismiss the UPUAA counts. They are correct that in *Hill v. Estate of Allred*, 2009 UT 28, 216 P.3d 929, the supreme court determined that "[t]he proper test for determining whether there was a pattern of unlawful activity is whether there was 'a series of related predicates extending over a substantial period of time' or a demonstrated threat of continuing unlawful activity[10] and not whether there were multiple schemes." *Id.* ¶ 41 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). That much, at least, was established law at the time of trial. However, the meaning of a "substantial period of time" under the UPUAA was not. The major UPUAA-related question in *Hill* was whether the district court was correct in concluding that the defendants' multiple actions in furtherance of converting the plaintiff's money constituted "only one episode of criminal activity" as opposed to "a pattern of unlawful activity," something not at issue here. *See id.* ¶ 35. Adopting and applying the "proper test" from *H.J. Inc.*, the court concluded that the "several incidents of unlawful activity" by the defendants "over a five-year period" "constituted a pattern of unlawful activity." *Id.* ¶ 41. Thus, other than briefly deciding that the five-year period was sufficient when combined with the other circumstances in the case to constitute a pattern of unlawful activity, *Hill* did not decide the meaning of "substantial period of time" as applied to closed continuity.

¶ 70 As a result, as Defendants concede, while adopting the concept as part of the "proper test" for determining whether there has been an unlawful pattern of activity under the UPUAA, neither our supreme court nor this court have provided any guidance about what actually constitutes a "substantial period of time." Because Utah appellate courts had not adopted a specific standard for determining whether a particular set of related acts meets the closed continuity requirement of "a substantial period of time" under the UPUAA, much less a rule that established the cut-off at a year or more, that issue was a matter of first impression in Utah at the time of trial and was therefore unsettled.

¶ 71 Nonetheless, as Defendants assert, the court in *Hill* chose to look to RICO federal case law as guidance for interpreting the UPUAA, and they contend that federal cases interpreting and applying the federal RICO statute have overwhelmingly declined to find a pattern in circumstances where the unlawful activities occurred over less than a year. *See, e.g., First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) (noting that "this Court has never found a closed-ended pattern where the predicate acts [to establish a pattern of un-

10. The supreme court noted in *Hill* that continuity " 'is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.' " 2009 UT 28, ¶ 39, 216 P.3d 929 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). Defendants characterize the "substantial period of time" component as applying to closed, not open, continuity, and they limit their argument accordingly. We therefore limit our discussion of continuity to closed continuity.

lawful activity] spanned fewer than two years"); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1266 (11th Cir. 2004) (noting that "[o]ther circuits have agreed that the substantial period of time requirement for establishing close-ended continuity cannot be met with allegations of schemes lasting less than a year"). On this basis, they contend that we should conclude as a matter of law that the "UPUAA imposes a minimum threshold of at least one year to allege closed continuity," and that, because the conduct constituting the pattern charged in this case occurred over a period of less than one year, "the UPUAA conviction[s] should be reversed."

¶ 72 However, as the court in *Hill* noted, "we are not obligated to give pattern of unlawful activity the same interpretation as pattern of racketeering activity under RICO." 2009 UT 28, ¶ 38, 216 P.3d 929. And deciding an unsettled question of state law as a matter of first impression does not fit within the rubric of ineffective assistance, plain error, or manifest injustice. *See Love*, 2014 UT App 175, ¶ 7, 332 P.3d 383 (explaining that counsel is not ineffective for "failing to advance a novel legal theory which has never been accepted by the pertinent courts" (citation and internal quotation marks omitted)); *State v. Davis*, 2013 UT App 228, ¶ 32, 311 P.3d 538 (explaining that, to demonstrate plain error, the appellant "must show that the law governing the error was clear at the time the alleged error was made" and that "an error is not obvious if there is no settled appellate law to guide the trial court" (citations and internal quotation marks omitted)). At the time of trial, no appellate court in Utah had determined what constituted a "substantial period of time" under the UPUAA or suggested that it was a question to which applying bright-line rules such as Defendants urge would be appropriate.

¶ 73 Moreover, even the federal RICO case law appears to be unsettled regarding how closed continuity may be met. Several circuits have specifically eschewed any bright-line rules on the question of continuity or as to whether a pattern of criminal activity exists and instead have embraced a flexible, fact-specific approach. *See, e.g., ePlus Tech.,*

*Inc. v. Aboud*, 313 F.3d 166, 182 (4th Cir. 2002) (explaining that "there is no mechanical formula to assess whether the pattern requirement has been satisfied" under RICO and that "it is a commonsensical, fact-specific inquiry"); *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 18 (1st Cir. 2000) (noting that *H.J. Inc.* requires a "natural and commonsense approach to RICO's pattern element" and that "its discussion of temporal factors did not mean that other considerations were to be entirely ignored" (citation and internal quotation marks omitted)). Indeed, it appears that the majority of circuit courts have determined that the continuity element, while it may be "primarily a temporal concept," is not reduced to solely a temporal inquiry where the amount of time between the first and the last predicate acts dictates whether the continuity element is met. *See Satinwood*, 385 F.3d at 181 (explaining that "[a]lthough continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists" (citation and internal quotation marks omitted)). Rather, courts have instead employed a number of factors in addition to duration to determine whether continuity exists. *See, e.g., id.; Jackson*, 372 F.3d at 1267 (analyzing continuity in terms of duration, number of schemes involved, and the "discrete" nature of the scheme's goal); *Efron*, 223 F.3d at 17–18 (explaining that continuity is a "common sense" inquiry where various factors in addition to duration ought to be taken into account); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134–35 (6th Cir. 1994) (analyzing continuity in terms of factors such as the number of victims, schemes, purposes involved as well as the duration of the related acts); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543–44 (10th Cir. 1993) (analyzing the continuity element according to a variety of factors, including "duration of the related predicate acts," "the extensiveness of the RICO enterprise's scheme," "the number of the racketeering acts," "the complexity and size of the scheme," and "the nature or character of the enterprise or unlawful activity," with the goal

of reaching "a natural and commonsense result" (citations and internal quotation marks omitted)); *United States v. Pelullo*, 964 F.2d 193, 208 (3d Cir. 1992) ("We have eschewed the notion that continuity is *solely* a temporal concept, though duration remains the most significant factor."); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1277–78 (7th Cir. 1989) (explaining that continuity is determined by "[r]elevant factors" that "include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries" (citation and internal quotation marks omitted)).

¶ 74 Further, it does not appear that the federal circuits are in full agreement about whether it is appropriate to impose a specific minimum durational requirement that, as matter of law, will preclude the continuity element from being met for alleged patterns failing to meet the minimum duration. Some circuits have adopted a bright-line rule regarding duration. *See, e.g., Satinwood*, 385 F.3d at 181 (explaining that two years is "the minimum duration necessary to find closed-ended continuity"); *Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) (holding that "twelve months is not a substantial period of time" as a matter of law for closed-ended continuity under RICO). But other courts have declined to reduce the duration factor to a bright-line rule. *See, e.g., Efron*, 223 F.3d at 17–18 (explaining that the duration must be at least more than a "few weeks or months" suggested by *H.J. Inc.*, but that, otherwise, continuity is a "common sense" inquiry where various factors in addition to duration ought to be taken into account (citation and internal quotation marks omitted)); *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) (explaining that a "bright line, one-year rule" "misconstrues the flexible continuity requirement under RICO" and declining to adopt such a rule at the defendants' request); *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) (acknowledging the multifactor test for continuity and explaining that the Seventh Circuit has declined to hold "that predicate acts spanning less than one year do not as a matter of law constitute a

substantial period of time" (internal quotation marks omitted)). Thus, although Defendants assert that we should adopt a one-year minimum threshold because federal courts have done so, it is apparent that federal courts interpreting federal RICO law are not as uniform in their interpretation of the duration element as Defendants contend. Therefore, even if we accepted the premise that federal decisions are fully persuasive precedent on the question, we are not persuaded that it was settled that closed continuity under the UPUAA could not as a matter of law be established by a pattern lasting less than one year. *See, e.g., Ashland Oil*, 875 F.2d at 1277–79 (explaining that "[t]he doctrinal requirement of a pattern of racketeering activity is a standard, not a rule," where the determination of whether continuity has been met "depends on the facts and circumstances of the particular case, with no one factor being necessarily determinative," and concluding that a four-month period was sufficient to constitute a pattern under RICO "in light of other evidence of continuity," including multiple victims, the variety of predicate acts, and the use of "several unlawful means" to achieve the scheme's goal).

¶ 75 Accordingly, because there was no settled, controlling law establishing that a period of less than a year did not constitute a "substantial period of time" for purposes of establishing closed continuity under the UPUAA, Defendants have failed to establish either plain error on the part of the trial court for failing to dismiss the pattern charge sua sponte or ineffective assistance of counsel for failing to request dismissal on that basis. *See State v. Edgar*, 2017 UT App 53, ¶ 16, 397 P.3d 670 (explaining that an ineffective assistance of counsel claim fails when the law on the challenged issue is "not settled in Utah" and the appellant "cannot demonstrate that the law in effect at the time of trial supports" his contrary argument); *Davis*, 2013 UT App 228, ¶ 32, 311 P.3d 538 (explaining that, under plain error review, "an error is not obvious if there is no settled appellate law to guide the trial court" (citation and internal quotation marks omitted)). Defendants' manifest injustice argument fails for the same reason. *See State v. Cooper*, 2011

UT App 234, ¶ 8, 261 P.3d 653 (explaining that "[i]n most circumstances the term manifest injustice is synonymous with the plain error standard" (citation and internal quotation marks omitted)).

¶ 76 Defendants argue alternatively that "the jury should have been instructed as to the 'substantial period'/threat of continuing activity and temporal requirements," and that counsel provided ineffective assistance by not requesting such an instruction and the court plainly erred by not instructing the jury on this point. We will affirm unpreserved challenges to jury instructions when the instructions "fairly instruct the jury on the applicable law." *See State v. Kennedy*, 2015 UT App 152, ¶ 24, 354 P.3d 775.

¶ 77 Here, the trial court instructed the jury that it had to find that Defendants "participated as a principal" in "a pattern of unlawful activity" in order to find them guilty of these counts. The trial court further instructed the jury that "pattern of unlawful activity" meant

[e]ngaging in conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics. Taken together, the episodes shall demonstrate continuing unlawful conduct and be related either to each other or to the enterprise. The most recent act constituting part of a pattern of unlawful activity as defined shall have occurred within 5 years of the commission of the next preceding act alleged as part of the pattern.

This language was taken directly from the definitions section of the version of the UPUAA in effect at the time. *See* Utah Code Ann. § 76-10-1602(2) (LexisNexis 2012). *Hill v. Estate of Allred* expounded upon the meaning of "continuing unlawful conduct" when it explained that continuity is a "closed-and open-ended concept," where continuity may be demonstrated either "over a closed period by proving a series of related predicates extending over a substantial period of time" or where "the threat of continuity is demonstrated." 2009 UT 28, ¶ 39, 216 P.3d

929. But, as the State notes, *Hill* was not a jury instruction case, and it accordingly did not reach the question of whether a jury had to be separately instructed regarding what constitutes closed or open continuity. Further, in *Hill*, the supreme court noted that the above-quoted statutory language itself includes the essential UPUAA elements of "continuity plus relationship," and it characterized its interpretation of the definition as a "clarification" to the meaning of "a pattern of unlawful activity" already set out in the Act. *Id.* ¶¶ 38, 41. And *Hill* did not purport to adopt "a substantial period of time" as a discrete, additional element of the pattern offense or indicate that a jury must be so instructed.

¶ 78 Thus, because the trial court instructed the jury based upon the definitions included in the UPUAA itself and *Hill* did not require that a jury must be specifically instructed regarding the nuances of closed and open continuity, it appears on its face that the jury was "fairly instruct[ed] on the applicable law." *See Kennedy*, 2015 UT App 152, ¶ 24, 354 P.3d 775; *cf. State v. Starks*, 627 P.2d 88, 90 (Utah 1981) ("If an instruction is supported by the evidence and its meaning is clear, an instruction in the form of statutory language is not improper."). As a result, we are unpersuaded that trial counsel was ineffective for failing to request a jury instruction including "a substantial period of time" as an element of a pattern of unlawful activity or that the trial court plainly erred by failing to give such an instruction.

¶ 79 In any event, Defendants have failed to explain how they were harmed by the omission of an instruction regarding the "substantial period/threat of continuing activity and temporal requirements." The word "substantial" commonly means "of ample or considerable amount, quantity, size, etc." *Substantial*, Dictionary.com, http://www.dictionary.com/browse/substantial. Even if the trial court instructed the jury that it was required to find the period of unlawful conduct to be "substantial," the jurors still would have been left on their own to decide what length of time constitutes "substantial" and to ultimately determine the issue factually; there was no controlling law in Utah to pro-

vide guidance to trial counsel in requesting an instruction or to the trial court in giving an instruction regarding the factors relevant to making such a determination. Here, Defendants' conduct underlying the pattern of unlawful activity charges occurred over a period between four to nine months. On its face, a period of such length does not appear to be insubstantial; rather, the jury could have appropriately decided that any period within this range was "of ample or considerable amount" or "quantity." Thus, we cannot say that the failure to instruct the jury that the unlawful conduct had to occur over a "substantial period of time" was harmful, i.e., that it would likely have led to a different outcome. *See State v. McNeil*, 2016 UT 3, ¶¶ 27–28, 365 P.3d 699 (explaining that to meet the prejudice standard, an appellant must show " 'that there is a reasonable probability that, but for [the alleged] errors, the result of the proceeding would have been different' " and that the prejudice standard under ineffective assistance of counsel and plain error is the same (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))).

## V. Restitution

¶ 80 Defendants argue that the trial court erred in its restitution award. The trial court ordered Defendants to pay restitution in the aggregated amount of the twelve checks the jury determined to be thefts—$189,574.33. First, Defendants contend that the release of claims in the Settlement, signed by both Defendants and the Victims, precluded restitution as a matter of law. Second, they argue that the consideration the Victims received as part of the Settlement should have been taken into account in the court's restitution order. Either way, they contend that no restitution should have been ordered. We conclude that the trial court did not err and affirm the restitution order.

¶ 81 Utah Code section 77-38a-302(1) provides, "When a defendant is convicted of criminal activity that has resulted in pecuniary damages, in addition to any other sen-

tence it may impose, the court shall order that the defendant make restitution to victims of crime[.]" Utah Code Ann. § 77-38a-302(1) (LexisNexis 2012). At the time, the restitution statute defined "pecuniary damages" as

> all demonstrable economic injury, whether or not yet incurred, which a person could recover in a civil action arising out of the facts or events constituting the defendant's criminal activities and includes the fair market value of property taken, destroyed, broken, or otherwise harmed, and losses including lost earnings and medical expenses, but excludes punitive or exemplary damages and pain and suffering.

*Id.* § 77-38a-102(6).[11] In addressing restitution, a court must determine complete restitution, which is "restitution necessary to compensate a victim for all losses caused by the defendant." *See id.* § 77-38a-302(2)(a). However, a court has considerable discretion over whether to impose court-ordered restitution and the amount to be imposed. *See id.* § 77-38a-302(2)(b) (defining court-ordered restitution as "the restitution the court having criminal jurisdiction orders the defendant to pay as a part of the criminal sentence"); *State v. Laycock*, 2009 UT 53, ¶ 28, 214 P.3d 104 (explaining that a court is not required to order court-ordered restitution). Defendants challenge the amount of court-ordered restitution.

### A. The Settlement

¶ 82 Defendants first argue that the court erred in ordering them to pay restitution in any amount at all, alleging that the Settlement precluded further recovery by the Victims because they released Defendants from all liability related to the checks. They point to the restitution statute's definition of pecuniary damages, which limits "economic injury" to that which may be recovered "in a civil action arising out of the facts or events constituting the defendant's criminal activities." *See* Utah Code Ann. § 77-38a-102(6). And they rely on the supreme court's decision in *Laycock* to support their argument.

---

**11.** Because the legislature has since amended the definition of pecuniary damages in the restitution statute, we cite the prior version of the statute.

They contend that *Laycock* stands for the proposition that the money represented by the checks could not serve as the basis for a restitution order because the supreme court in *Laycock* noted that a court may determine restitution only "on facts that would meet the same strict requirements as found in a civil setting." *See* 2009 UT 53, ¶ 23, 214 P.3d 104. In this regard, Defendants contend that *Laycock*, "at least in dictum, reaffirms that an amount not recoverable in a civil action is not properly awarded in restitution," and they allege that it was therefore improper for the court to award restitution here, where the release would preclude recovery of the amount represented by the checks in a civil action. In sum, they contend that, because the release would bar the Victims from recovery on the checks in a civil action, the Victims cannot recover their economic losses based on those checks through a restitution award. We disagree.

¶ 83 In *Laycock*, the supreme court primarily considered two questions: first, whether "a civil settlement between a defendant and a victim, which includes a release of all claims by the victim, may bar a district court from imposing restitution in a criminal action involving the same incident," *see id.* ¶¶ 12–18, and second, whether the district court abused its discretion in relation to the actual restitution it ordered, *see id.* ¶¶ 19–34. Before reaching the question of whether the district court wrongly included amounts in the restitution award that would not be recoverable in a civil action, the supreme court determined that a civil settlement and release of claims between a defendant and a victim does not bar a court from imposing restitution in the related criminal case. *See id.* ¶ 18. Defendants do not acknowledge this aspect of the *Laycock* decision, but we conclude that it significantly undermines their argument that the release bars a restitution award under the circumstances here.

¶ 84 In *Laycock*, the defendant pled guilty to negligent homicide of the victim's husband; the defendant had fallen asleep while driving and had hit the husband's vehicle head-on. *Id.* ¶ 3. In the negligent homicide criminal case, the court awarded court-ordered restitution but failed to determine complete restitution. *Id.* ¶¶ 4, 24. In the meantime, the victim's family had filed a civil action against the defendant for wrongful death. *Id.* ¶ 5. Before the criminal restitution proceedings concluded, the civil action was settled, and as part of the settlement, the victim "executed a Release of All Claims that released [the defendant] from any past, present, or future claims." *Id.* During the same period, the State filed a petition in the criminal case, asking the court to determine complete restitution. *Id.* ¶ 6. Before oral argument on that petition, the defendant filed a suggestion of mootness based on the settlement agreement, arguing that the settlement had "effectively extinguished all of [the victim's] claims against [the defendant]," including any claim for restitution. *Id.* ¶ 14.

¶ 85 The supreme court determined that a civil settlement and release of claims did not bar the district court from imposing restitution as part of the criminal sentence. *Id.* ¶ 18. The court explained that, while the release may have ended the civil controversy between the defendant and the victim, it "did not affect the criminal proceedings between the State and [the defendant]." *Id.* ¶ 15. The supreme court reasoned that the purpose of restitution is not solely to compensate the victim for pecuniary losses caused by the defendant; rather, restitution "is part of a criminal sanction imposed by the state," and it therefore has "a two-fold purpose": (1) "to compensate the victim for pecuniary damages," and (2) "to rehabilitate and deter the defendant, and others, from future illegal behavior." *Id.* ¶ 18. It explained that the settlement and release did not address or resolve "the rehabilitative and deterrent purposes of restitution." *Id.* As a result, the court concluded that the restitution issue was not moot because, notwithstanding the release, "the dual purposes of restitution have not been fulfilled." *Id.*

¶ 86 Similarly here, although Defendants contend that there is some language in *Laycock* that suggests some relationship between court-ordered restitution and an amount that could be recovered in a civil action, they fail entirely to address the supreme court's initial holding that a civil settlement and release do not bar imposition of restitution in a related

criminal case. The State in the present case was not a party to the release of claims between Defendants and the Victims; therefore, as in *Laycock*, the State's interests were not foreclosed by the release. As a consequence, the release did not bar the State from seeking restitution or the trial court from imposing restitution as part of Defendants' criminal sentences.

## B. Double Recovery

¶ 87 Defendants next contend that the trial court erred by essentially granting the Victims a double recovery through its restitution order. "[I]n the case of restitution, a reviewing court will not disturb a district court's determination unless the court exceeds the authority prescribed by law or abuses its discretion." *State v. Laycock*, 2009 UT 53, ¶ 10, 214 P.3d 104. Defendants argue that the court erred by failing to take into account, in its court-ordered restitution determination, the consideration the Victims received as part of the Settlement, which included the "rezoned and retitled 29 acre property and the UDOT payment." They contend that the court therefore wrongly ordered them to pay restitution in the amount of $189,574.33, "the aggregated check amounts," and thereby granted the Victims a double recovery because the value of the Settlement at least equaled all their possible losses. We are not persuaded. Defendants do not engage with the basis of the trial court's decision to award restitution in the amount of the aggregated checks, and, as we explain below, we conclude that the court did not exceed its discretion when it decided to base the restitution award on the amount of the checks.

¶ 88 The trial court did, in fact, order Defendants to pay as restitution the total amount of the checks underlying the theft counts on which jury found them guilty. But the court reached its determination of the restitution amount only after rejecting on an evidentiary basis the argument that Defendants make on appeal. The court decided that the evidence presented regarding the value of the Property—both pre- and post-settlement—was too speculative to form the basis of the restitution order. Instead, the trial court decided to base restitution upon the non-speculative amount represented by the thefts, the known loss associated with Defendants' criminal conduct.

¶ 89 In the proceedings below, the State requested that the court award restitution based on the difference between the value of the Property at the time the parties entered into the REPC and the value of the Property after it was returned to the Victims and they had then given up half of the Property to satisfy the hard-money loan obligation. The State urged the court to consider the starting point of the calculation as the Property's $3.5 million purchase price, which it contended was "a fixed number" that represented what the Victims would have received "but for the Defendants' actions." And from the $3.5 million, the State proposed deducting the estimated value of the Property at the time the Victims finally received it free of Defendants' interests as a result of the Settlement as well as other amounts, such as the monthly payments the Victims received in the first months after Tivoli was formed. The State asserted that value of the Property at that point was $749,696, which was based upon a Utah County tax assessment value of the half of the Property the Victims retained after entering into an agreement with an outside investor to satisfy the monetary obligation. Based on these calculations, the State contended that the total restitution award should be approximately $1.9 million, with each defendant responsible for half.

¶ 90 In response, rather than propose their own formula for calculating restitution, Defendants sought to discredit the State's approach by demonstrating that using the State's rationale, but substituting their own post-Settlement valuations of the Property, the trial court should conclude that the Victims had gained rather than lost value in the end and that no restitution should be awarded. In this regard, Defendants contended that the court should consider the value of the full twenty-nine acres, because that was what the Victims received in the Settlement, and that the court should not take into account the Victims' decision to thereafter give up half the Property to resolve the hard-money loan because evidence of that deal was

based only on the Victims' testimony, and the deal should not be considered as an arms-length transaction. Accordingly, they argued that, at the time of the Settlement, the Property was worth substantially more than $749,696 when returned to the Victims—"at least $8.6 million"—with much of the appreciation in value due to Defendants' efforts in rezoning it. In support of their valuation, Defendants argued that the court should value the Property at the $290,000 per-acre price they contended UDOT had been willing to pay when it acquired approximately .60 acres of the Property before the Settlement.[12] Defendants also submitted a commercial appraisal that valued the Property at $6.7 million, factoring in the rezoning. They concluded by arguing that "under the State's rationale" and using the value of the entire twenty-nine acres, the Victims had actually received a windfall of nearly $6 million over the original $3.5 million purchase price for the Property and there was thus no basis for any restitution award.

¶ 91 The trial court rejected both the State's and Defendants' restitution calculations, reasoning that "valuing the property, whether we value it at what it was worth when they came into this, or what it was worth at the moment they walked out, or what it's worth now, all starts to become speculative." The court expressed concern that the parties had not provided the court with a reliable method for determining the Property's value. For example, the State's approach depended on restitution being determined essentially by the difference between the Property's purchase price and its post-settlement value, net of certain offsets. In this regard, the State used the original purchase price of $3.5 million as the baseline value for the Property, and Defendants used the same baseline for their own proposed calculations. But at the restitution hearing the State admitted that, apart from the fact that the parties had agreed to the purchase price, it had no evidence of the Property's actual fair market value at the time of sale. And the court questioned whether the $3.5 million was an accurate estimate in any

event, where the Victims "could only get a loan" at the time for $750,000—the hard-money loan, which seemed to the court to indicate that the Property was not worth much more than that amount at the time of sale. In addition, the court expressed doubt about the State's contention that half of the Property, which was allegedly valued at $3.5 million in its entirety before entitlement, was valued at only $749,696 post-settlement, even after Defendants' efforts in obtaining development approval from the city.

¶ 92 The court also expressed concern about the reliability of Defendants' post-settlement valuations. Defendants contended that their contributions greatly increased the value of the Property, pointing to a post-zoning appraisal that valued the full twenty-nine acres at $6.76 million and extrapolating an $8.6 million value from the amount UDOT paid for a small parcel near the time of the Settlement. Defendants claimed that, through their efforts, they "made the [Victims] wealthy" by returning to them property that was worth substantially more than it had been at the outset. But the court expressed that, although it understood Defendants' argument that their contributions to the Property increased its total post-settlement value by millions, it was not clear how those contributions ought to be appropriately factored into the calculations for the Property's valuation or the restitution amount, especially in light of Defendants' criminal conduct.

¶ 93 To resolve its concerns, the court instead rejected entirely the parties' proposed calculations and determined that it made more sense "to value the restitution based on" "the actual theft amount," "according to the jury and according to the contract as we heard it." It stated that "there were ... 12 checks written that the jury found were not appropriate and were thefts" in the total amount of $189,574.33 and that these checks established a reliably calculable sum in terms of the Victims' monetary loss: "The money would not have been there for spending but for the [Victims'] land," and "100 percent" of

---

12. We note that below Defendants did not include the UDOT payment in their proposed restitution calculation or argue to the court that that

payment should have factored into the restitution calculation as a separate component.

the value of the checks was "the [Victims'] money" as far "as the jury was concerned." The court noted that "when the jury found the Defendants guilty" of theft, it "had meticulously and carefully gone through a list of every single check," which included marking the checks the jury "thought had been paid back." The court therefore ordered Defendants to pay restitution in the amount of $189,574.33, to be allocated equally between them.

¶ 94 In essence, then, the court concluded that the amount represented by the thefts was sufficiently certain as an evidentiary matter to support a reliable restitution determination, whereas the value of the Property at pertinent points in time—whether presale, settlement, post-settlement, or at the time of the hearing—was not. We defer to the trial court regarding the weight it assigns to the evidence and in its credibility determinations. See State v. Hodges, 798 P.2d 270, 274 (Utah Ct. App. 1990) ("In a bench trial or other proceeding in which the judge serves as fact finder, the court has considerable discretion to assign relative weight to the evidence before it. This discretion includes the right to minimize or even disregard certain evidence."). Defendants have not challenged the trial court's decision to reject on an evidentiary basis their proposed restitution calculation. Instead, Defendants simply argue that the trial court erred when it failed to take into account the value of the Settlement as a total offset to any harm the Victims may have suffered from the thefts; they do not engage with the court's reasoning that the evidence of value presented by both sides was too speculative to support a reliable valuation of the Settlement's economic effect, that is, whether the result of the Settlement made the Victims whole. As a result, Defendants have failed on appeal to challenge the basis for the trial court's decision to reject their valuation evidence and base the restitution award on the theft amounts. See Duchesne Land, LC v. Division of Consumer Prot., 2011 UT App 153, ¶ 8, 257 P.3d 441 (concluding that the appellants had failed to persuade this court "that the district court's ruling constituted error" where the appellants had "not addressed the actual basis for the district court's ruling"); see also Allen v.

Friel, 2008 UT 56, ¶ 14, 194 P.3d 903 (explaining that "[s]ince an appeal is a resort to a superior court to review the decision of a lower court, Utah appellate rules require the appellant to address reasons why the district court's [decision] should be overturned"). And as a necessary corollary, because Defendants have failed to challenge the district court's conclusion that the value represented by the Settlement did not provide a reliable evidentiary basis for restitution, Defendants have also failed to persuade us that the trial court's actual restitution award amounted to a double recovery.

¶ 95 In any event, we cannot fault the court for deciding to base its restitution determination on the certain amount represented by the checks the jury determined to reflect amounts stolen from the Victims instead of on the parties' various valuations of the Property, which the court determined were unreliable and to which the court gave little weight. It is well within a district court's broad discretion in determining criminal restitution to reject a party's valuation contentions on the basis of evidentiary concerns. See State v. Laycock, 2009 UT 53, ¶¶ 25–29, 214 P.3d 104.

¶ 96 For example, in Laycock, the State had requested that the district court find "as a matter of law that no allocation of fault should be assigned to [the victim's husband]," who was killed in the accident, and that the court include loss of the husband's future earnings—in the amount of nearly $600,000—in its court-ordered restitution determination. The district court declined the State's request on both points because of the "limited factual basis," where the evidence established the fact of the accident and provided limited information about the surrounding circumstances but not much more. Id. ¶¶ 2–3, 27. In light of the limited evidence, rather than assume for purposes of court-ordered restitution that the driver who was killed by the defendant was not himself negligent, the district court decided "to allow the facts to be established in a civil litigation setting" instead of "impos[ing] court-ordered restitution based on" any assumptions about negligence. Id. ¶ 27. And as to loss of earnings, the district court also concluded that "the facts

were too limited to justify court-ordered restitution for an array of damages including lost wages." *Id.* ¶ 28. Accordingly, the district court based its restitution order upon the readily ascertainable amounts of the medical and funeral expenses and the damage to the deceased's car. *Id.* ¶ 4. The supreme court held the district court's decisions to be within the court's discretion, observing that "[r]estitution should be ordered only in cases where liability is clear as a matter of law and where commission of the crime clearly establishes causality of the injury or damages," noting that "[w]hen the facts of a case are limited or unclear," such as in "[m]atters of negligence, proximate cause and the amount of resulting damages," "the civil setting is the best place for them to be determined." *Id.* ¶ 29 (citation and internal quotation marks omitted).

¶ 97 In the present case, like *Laycock*, the trial court determined that the parties' approach to "figuring out restitution by valuing the property ... [was] too speculative at this point in time" and instead decided to base restitution on the known value of the thefts for which Defendants were convicted. In other words, the trial court concluded that "the facts were too limited to justify court-ordered restitution" based on the speculative value of the Property at various points in time during the parties' association and the subsequent legal proceedings. *See id.* ¶ 28. We cannot fault the trial court's decision in this regard when, at the time of the restitution hearing, Defendants' liability for the thefts was "clear as a matter of law" and the jury, through its verdict, established the "causality of the injury or damages" for the thefts from the Tivoli capital. *See id.* ¶ 29 (citation and internal quotation marks omitted). We also cannot fault the court for exercising its discretion to base restitution upon the theft amount when each party presented the court with fairly complex calculations and proposed valuations that, in the court's estimation, failed to adequately account for what the court considered to be pertinent considerations, such as Defendants' overall contributions to the Property or the effect of their criminal conduct. *See id.*

¶ 98 And certainly, in these circumstances, the court was not required to simply accept

Defendants' argument that what the Victims received at the time of the Settlement, consisting primarily of the full twenty-nine acres of the Property, adequately took into account the effect of Defendants' criminal actions on the Victims. *See id.* ¶¶ 27–29 (explaining that a court determining restitution has discretion to "refuse to impose court-ordered restitution" on the basis of assumptions or for matters or categories of loss on which it determines it has only a "limited factual basis"). Indeed, one of the main points of disagreement between the State and Defendants during the restitution hearing was whether it was appropriate for the court to take into account the Victims' contention that they lost half of the Property post-settlement to satisfy the hard-money loan obligation Defendants persuaded them to incur, and calculate the restitution accordingly. Therefore, we are not persuaded that the court exceeded its discretion in ordering Defendants to repay to the Victims the actual amounts Defendants stole from what was, in effect, the Victims' direct contribution to Tivoli's capital rather than attempting to effect a complex reconciliation of Defendants' and the Victims' economic entanglements on the basis of evidence the court judged to be speculative and unpersuasive.

¶ 99 In sum, we conclude that, under *Laycock*, the Settlement and release did not as a matter of law preclude the Victims from being awarded restitution. We are also unpersuaded that the restitution amount ordered was the result of the trial court's abuse of discretion or error. Accordingly, we affirm the trial court's restitution order.

## VI. Cumulative Error

¶ 100 Finally, Defendants contend that we should reverse on the basis of cumulative error. "We reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had." *State v. Davis*, 2013 UT App 228, ¶ 16, 311 P.3d 538. But "because we have found no error in this case, the requirements of the cumulative error doctrine are not met." *See State v. Killpack*, 2008 UT 49, ¶ 62, 191 P.3d 17, abrogated on other grounds as recognized by *State v. Lowther*, 2017 UT 34, 398 P.3d 1032,

## CONCLUSION

¶ 101 For the foregoing reasons, we affirm Defendants' convictions and the trial court's restitution award.